Ladies and gentlemen, our first case for this morning will be William Hurt and others against Matthew Wise. Mr. Whitehead, are you going to be the first? Yes, Your Honor. May it please the court, my name is Cliff Whitehead, and I represent the appellants Jeff Vantland, Jack Spencer, Jason Pagin, and William Marbol. We're asking this court to reverse the district court's denial of qualified immunity on the plaintiff's remaining claims. First, plaintiff's claims of the Fourth, Fifth, and Fourteenth Amendment violations that are solely based on the interrogations of William Hurt and Dieter Hurt, as the plaintiffs did not violate a clearly established law or right, and the district court conducted no analysis on whether the defendants, the appellants, violated a clearly established right. I don't know quite how you can say that. You know, you said some things like that in your opinion, but the district court's opinion, which is a lengthy opinion, goes through the arguable, probable cause analysis. It's hard for me to see what she didn't identify as a relevant legal issue. Yes, Your Honor, she did spend time on that as well. But as far as the interrogations of what clearly established right was or was not violated during the interrogations, we believe she did not connect that analysis, and specifically White v. Pauley, on that issue. It requires a case that is particularized to the facts. That's been the law for a long time, ever since Anderson against Creighton, and she recognizes that. And in fact, cites White versus Pauley. I don't think there's anything to be read in one citation or another. So are you going to focus on the Fifth Amendment coercion claim, or are you going to focus on the Fourth Amendment false arrest claim? Because the analysis will vary, depending on what you're talking about. Yes, Your Honor, it does still come down to, in our opinion, William Hurt's confession on his Fifth Amendment, on his Fourth Amendment claim. Because if his confession was not coerced, then it did provide probable cause to arrest William Hurt, Deidre Hurt, and Andrea Hurt. So getting to that interrogation. Well, but I'm not sure. I think you might be jumping a little too quickly. A confession might be coerced, or it might not be coerced. A confession might be reliable, or it might not be reliable. So if you stood there, and I fed you information, and you're just standing here in the courtroom, I'm not coercing you, and I said, X happened. And you said, yeah, OK, X happened. And I said, Y happened. And you said, oh, OK, Y happened. That might be very unreliable as a confession, but it might not satisfy the coercion notion. Yes, Your Honor, I agree. And so on that reliability point, the confession did have aspects of it that matched the physical evidence in this case. Boy, I couldn't see much. I looked at the evidence that was fed to William. And aside from trivia that doesn't really tell you anything about whether there was a murder or not, or whether he was connected with any murder, you can tell me what you think your best evidence is. But I've got to say, this is an uphill battle. I think the best evidence that the confession was reliable was two things, really. The folding of the baseball cap in the front right pocket. Why is that? It's OK, I knew you were going to say that. So this man was William's, in effect, his uncle. We can not worry about biology here. First of all, I could tell you which pocket my husband normally puts his wallet in, too, because he's a person I know, and I see him do that a lot. And so if you said to me, which pocket did he put his wallet in, I would be able to tell you which one. Women don't normally have pockets, so it doesn't count for us. And actually, in the confession itself, he's not even consistent about whether it was folded. So I don't know how knowing where a relative's baseball cap is lodged tells you that he's in any way connected with the death of that person. And I agree with your hypothetical, but if William had said something like, I know that the baseball cap was in that pocket because that's where he always keeps it, or I saw him put it there previously, I agree with your hypothetical. Why does he need to say that? He just tells them, he's guessing. Of course, the other thing is that he had a 50-50 chance, and most people are right-handed. It'll be in the right pocket. And I submit to you that he actually had a 25% chance. Front left, front right, back right, back left. But he didn't guess. He stated it verbally, what pocket, front right. And then when the officer said, OK, show me how you did it, and they specifically asked how the baseball cap was put into the pocket. Not generically, or how'd you see it before. And he got up and he showed, we folded it and put it into the front right pocket. So in your view, if the only evidence against William was the baseball cap, do you think that would have been probable cause to arrest him? No, Your Honor. All right, so you really do need something else. Yes, and I think the something else is the manner in which William demonstrated that the victim was strangled in this case. And how else would you strangle somebody without using your thumbs? And that's a great point, and that was discussed in the depositions as well. And the officer said, well, you can put the neck and the forearm, a choke hold behind them, and that would be another way of doing that. And that was not described by William and demonstrated well. By this time, William has been fed the fact that Mr. Golicki was, in fact, strangled, that the hyoid bone was broken, which I certainly accept that the bone is broken. And it's often, your medical examiner says that's very often a sign of foul play. The question is, why is it William? So I think you have to take everything that they have. I have looked at it. They feed the following information to him. Properties missing from Marcus, there's a physical confrontation. They feed that Marcus was wearing the baseball cap, that he was hurt before he got in. They feed that he was choked. So he didn't know that. I mean, it's just a giant list of things that they fed. And he also had. And Vantlin knows that it's a problem. He says so. He says, we got this worthless confession that we created. Well, I do agree that the confession is necessary as part of the probable cause. We never hid from that. That's helpful. The confession is necessary. And we think that the confession was valid and should be upheld, and therefore would lay the foundation for probable cause. Mr. Whitehead, I need to ask you about jurisdiction and the scope of our jurisdiction. And one way to get at that is there are only a few kinds of issues that we can consider here. I look at your statement of issues in your opening brief. It's two full pages long, most of which seem to me quite clearly beyond the scope of our jurisdiction, and ask us to reweigh facts and the factual findings of the district court against the summary judgment record. What would you say are your best two or three abstract issues of law over which we might have jurisdiction on this interlocutory appeal? The confession. Did the appellants violate a clearly established right during the confession? And if not, then the confession can support probable cause. Well, first of all, I'm not entirely sure about that logic of the plaintiff's case. But I'm more concerned about the reliability of the confession and what the defendants understood about the reliability of the confession if I get into the merits, not about whether it might have been coerced. And I don't see how we can answer that question about reliability without diving in completely to the granular detail of the summary judgment evidence, which the Supreme Court told us in Johnson not to do. Well, and again, I'll keep directing back to the confession is what matters and is central. And it was videoed. But you can't evaluate its reliability without looking at the entire case, can you? I agree with that. But the entire case, the totality of circumstances that led up to that, there are no genuine issues of material fact on the reliability components, what was said in the interrogation versus what happened, what the officers knew at the time of the interrogation. And so for qualified and arguable probable cause, this court can look at whether the confession was reliable. Well, OK. And in terms of whether it's reliable, William testified or told the police that they had dumped the body, eventually he told them, in a dress plaza in downtown Evansville, right? Yes. And that was which direction from where the body was found? It was upstream from where the body was found. Upstream or downstream? It was downstream. Yes. Yes. Miles downstream. Yes. Right? Doesn't that alone suggest there's a serious issue of reliability about this? That is a problem fact. And we don't deny that. But you have to look at the totality of circumstances as a whole and not just one fact. That's my problem. And that's my problem with the scope of our jurisdiction. And I submit that what these officers knew is they had one bad fact. And that is for the prosecutor to argue the case. They're just supposed to investigate what they find. They had more than one bad fact. They had a lot of bad facts. Mr. Golicki didn't even own a debit card, much less have somebody else use it at the kangaroo late at night. They couldn't possibly have had evidence of that. And that didn't help. Because it doesn't exist. Or at least, you have to take as established that there is no evidence at the kangaroo, that there's no debit card, that all of these facts that you would like us to take your way are, in fact, not facts that we can do that with, which is Judge Hamilton's point. And on that point, I see my red time. But I would like to respond to that. No, that's all right. And I'm going to make sure your opponent. Very briefly on that. The bad facts about the kangaroo did not occur until after they were arrested. So this court should not consider those, because they occurred after the arrest. At the time of the arrest, the officers believed the kangaroo visit occurred. It's not just the arrest. It's also the prosecution, right? The question here has to do with people who were deprived of their liberty for a time, correct? Yes. And those deprivations of liberty go on, for example, long after this kangaroo problem convenience store has surfaced, right? Yes. So that goes into the Melissa's prosecution claim. And on that claim. And also the false arrest claim, particularly after the city of Joliet. And I submit that the case law says that it's at the point of arrest, which the facts known to the officer at the time of arrest are relevant to the arguable probable cause qualified immunity analysis. OK. I think we have your point. So we will leave it at that. OK. Thank you. And we'll hear from you, Mr. Bell. And you will have whatever time it was you wanted. I think we have six minutes, Your Honor. But that's up to you, of course. You may have your six minutes. OK, thank you. I'll be very brief. The Kentucky State Police's, who I represent, Jones and Wise, those two officers, we had a very limited role, as the court read in the briefs. We did not, we were not the arresting agency. We were not the lead agency. Two days in, we learned this was an Evansville crime. So I think we are situated differently than the EPD to some extent. For example, the malicious prosecution claim is not against us. We did not have arrest authority. We did not have arrest power. We simply did a preliminary investigation. And then they asked us to come back to participate in the interrogations. And we did so. No, you certainly did so. I mean, I watched the interrogations. Absolutely. And they are, they're pretty brutal. Well, it turned out. And it was Officer Jones who was doing quite a bit of it. Turning to those, the parents were contacted. They were not only contacted, they were present at the. No, but I'm saying, you've invited us, oh, watch the videotape. This is like Harris. And so I watched the tape. And it's very disturbing to see fact after fact after fact fed. I'm going to focus on William. I mean, we have the other interrogations too, but focusing on William. We have him breaking down in tears. We have him just browbeaten by Jones, among other people. The issue to me, Your Honors, is is there a clearly established law that tells our officers that fact feeding, for example, is improper? And we submit that there is not. Well, but you know. But there may not be an abstract holding to that effect. The overall question has a lot more to do with reliability than coerciveness for these purposes. And I don't know how a police officer thinks a confession is reliable when the officer has provided all the information. And I would agree with that. I think we've cited in our briefs the information that they did not cite and that they filled in several things, such as the ball cap. The demonstrations at the end, if you watch it, the officers did not tell him how to demonstrate or where to put his hands. William puts his hands on his throat first. Any idea whether that, I mean, but who knows whether that's what happened, right? I mean, that's. He could be guessing. They have fed him the fact that Marcus was strangled. Well, and. And that, so you tell me, you know, somebody was strangled. How did it happen? Wouldn't be that hard. I've watched enough TV shows, you know, to know what likely looks like. An interesting case I would refer you all to is US versus Lee out of this circuit in 2010. In that case, the plaintiff continued to disagree throughout the interrogation. And the court noted that was significant evidence that his will was not overcome. But see, you're still on coercion. You're not answering the question that Judge Hamilton is asking, which is the reliability question. And as I said to Mr. Whitehead, something can be reliable and coerced. Something can be reliable and not coerced. And any way you want to switch it around, there are two different problems. And our big problem here is, based on the way they conducted this interrogation, you know, and I found actually the expert report from Mr. Dreisen very helpful in this respect, just sort of pulling out of the record all of the information that was fed to him. And so I'm not worried about whether they let him use the restroom. I'm not worried about whether his parents were sitting out there. That all goes to the coercive nature. Now, they did violate the read technique. But that's not my problem, really. The question is, is this a reliable confession on which, you know, and did they make it? Did they know that they were creating an unreliable confession? Yes, I don't. Or would a reasonable person, you know, at the arguable probable cause level, have any reason to think this was OK? And I think it was, you know, arguable probable cause is such a low standard. But it's not a non-existent standard. Absolutely right. And so when you have an 18-year-old, this is an adult. These aren't juvenile confessions. Yes, but you know, I mean, if we want to go there, the Supreme Court has also pointed out that the age of 18, one's frontal cortex is not fully developed. It's not until 25 or 26. And the Supreme Court itself has recognized that. So we're not making this up out of thin air. I understand. I have not found. He's very impressionable. And he's also very vulnerable. He's a foster child. He's been living in this family successfully. They know that. I have not found one clearly established law that I can go back to my officers and say, here's the case you violated. As a matter of fact. So here's what you tell your officers. If you're trying to get a confession, don't feed 100% of the relevant facts. Whether a baseball cap is in a pocket or not, or whether a fairly obvious way of strangling somebody has happened isn't, I mean, I thought there was a concession that those two facts alone would not have been enough. I think, Your Honors, if I look what was the clearly established law in June of 2012, it was Fair v. Michael C., Lido v. Chapala, U.S. v. Lee, and Etherly v. Davis. I'm not aware of any case that said, we may not like what was done. We may not look at this and say, oh, that's a perfect interrogation. But there's no clearly established law that says what our officers did was unconstitutional. Ailman doesn't. And that's the only case they cite is Ailman. And Ailman involved a Miranda violation. Totally different situation. Well, it also involved Davis. My question, let me go back to the jurisdictional problem, though. You want to focus this on techniques. But I understood the district judge's analysis in the plaintiff's case to be much more focused on reliability of results, given the overall context of the case. I don't know how we decide that on a nearlocutory appeal here. Because we have the district judge saying, in essence, Marcus committed suicide. The confessions were coerced, involuntary, and unreliable, at least as I understand what the district judge was saying. And that the defendants knew that or should have known that. Now, if that's the factual premise that you're willing to live with on this appeal, and I think you have to for us to have jurisdiction over any of these questions, then it's pretty hard to see why going forward with arrests and prosecutions based on an unreliable confession and very little else is not contrary to clearly established law. And again, we were the Kentucky State Police. We didn't make arrest decisions. So I have to make that point on behalf of my clients. We are a little bit different. And I think all we do is we look at what did we do in the interrogation. And the false arrest claim, to me, should not stand because we weren't the arresting agency. The issue with jurisdiction, to me, comes down to the videotape. Can I just interject? I mean, back in the pre-Manuel against City of Joliet days, which weren't so long ago, in the Seventh Circuit, you would have been making a great argument.  to the moment that maybe you're presented to a magistrate or something. And then we move over to due process. And we didn't have any concept of continuing arrest and all the rest of it. You probably know the law. But the Supreme Court told us that we were wrong in Manuel against City of Joliet and that there was this notion of a continuing arrest. And if the whole problem was that there was no probable cause, or I'll add here, because it's an immunity case, no arguable probable cause, then the Fourth Amendment still applied. And your clients were people who played a role in the duration of his detention, the continuing arrest, if I can call it that, from the Manuel language. We played a role in the interrogations. With all due respect, I don't think we played any role in the arrest or what happened after that, if that's what the court's saying. The arguable probable cause to me, that's what's so puzzling to me. The Southern District said, the court concludes that reasonable minds could differ. That's not the right test. But that's earlier. Then she goes on. You harp on that. A jury could reasonably conclude that William's confession was voluntary and that it was objectively reasonable. If a jury could reasonably conclude that, that's arguable probable cause. If they accept your version of the facts. Yes. That's where you're getting the summary judgment standard mixed up with qualified immunity. Yeah, yeah, yeah. OK. And over on page 29 of her opinion, she says, defendants also invoke qualified immunity. And she says, when the constitutionality of the action depends on the existence of probable cause, the officer must have had, quote, arguable probable cause for qualified immunity to attach. She cites relevant cases. And she's very careful to say, those officers that reasonably but mistakenly believe they have probable cause are still protected. And that was our frustration. She cited the law, but then didn't apply it or follow it, in her opinion. She did if you take the plaintiff's facts. If your facts turn out to be right, I mean, this decision, if we do have jurisdiction, or to the extent we have jurisdiction over this appeal, is interlocutory. A jury will resolve facts. I think it's no different than Correll. I think it's no different than Gill. I think it's no different than many of the other cases this court has decided. We are not here to argue facts. I think we have to argue abstract issues of law. And we were very careful in citing our facts to rely on what was undisputed or what they said. I'm not sure, Mr. Bell, whether you're the person to address or Mr. Whitehead about this. But at least one of the real issues of law that's presented here is presented, as I understand it, by the argument that no constitutional rights are violated by fabricated police evidence or coerced or unreliable confessions if no conviction is obtained. Is that? I think that's more him, because that comes to the- I'm going to ask Mr. Whitehead this question now, then. And he can think about it for rebuttal purposes. And I'd be curious about the plaintiff's thoughts as well. I had understood, and I think we said in the Armstrong against Daley case, that what the due process clauses of both amendments deal with are deprivations of liberty, not convictions. And if this kind of fabricated evidence that we have to assume for these purposes and unreliable confessions that we have to assume are used to deprive somebody of liberty, I'm not sure why the absence of a conviction makes any difference. And I also don't think that's an issue that's relevant to qualified immunity. But I'll welcome input on that. If it gets into the fabrication of evidence issue, I think that's more them. That claim is not against the Kentucky State Court. You guys were out of the picture by that, as far as you're concerned. We were out of the picture by then. We did the interrogations. We were done. We did not make any arrest decisions. From that point forward, we were out. OK. Thank you. OK, thank you very much.  All right, thank you so much. Ms. Lovey. Good morning. May it please the court. Deborah Lovey, on behalf of the plaintiff and my appellees. And I think you all honed in on some of the real problems with the appellant's arguments. By collapsing the Fourth and the Fifth Amendment, they tend to muddle it. When you separate them out, separate claims, separate proofs, separate standards, the jurisdictional problems become readily apparent. And the fact that we have clearly provided proof on both claims becomes apparent. So aren't there some abstract issues of law? I mean, this didn't strike me as a case where the only thing in front of us was disputed fact issues. Judge Hamilton just articulated one question. And I would agree. I think there are several. I think both the Fourth Amendment and the Fifth Amendment present abstract issues of law. What do you think they are? I think with regards to the Fourth Amendment, there's no dispute about the constitutional principle being clearly established. You're not allowed to rely on evidence you know to be false. So that part's solid. And there's no jurisdiction to dispute the factual findings of the court. The court found that the defendants lacked arguable probable cause. And you regard that as a factual finding? We had some discussion in the briefs, particularly, I can't remember which of your opponents, but about the fact that the interrogations of both William and Deidre and the others are videotaped. And so they say, Scott against Harris. It's a videotape. Just watch the tape. Precisely. And that gets us to the only legal issue that I see under the Fourth Amendment. And that is, the defendants suggest that you should re-evaluate the videos and look at that, look at the videos to decide. They're mistaken. There's no jurisdiction for that. There's nothing in Scott that suggests that you should look at the videos. And while I stand by the videos, I agree with you. I think they are heartbreaking and they support the claims and they support what the district court's findings were. I think the law is clear that when the district court finds that the video supports the non-movement's position, there is no jurisdiction for this court to evaluate the videos and decide whether or not it agrees with that evaluation. So the problem in Scott was that the video, I'm going to say in Scott, maybe because the video simply resolved underlying facts, like did somebody run a red light, or did they bump up onto the curb, or whatever. We don't have facts like that. It was twofold in Scott. There was one problem that, yes, it was objective facts. Were there pedestrians present? Did they run a red light? As opposed to, was William having a panic attack? But the second problem in Scott is if you go look at the lower decisions, they didn't use the video at all. They credited the plaintiff's self-serving evidence of I didn't run red lights, or there weren't pedestrians, or whatever his self-serving claims were. And they don't adjudicate, they ignore the video altogether. And Scott says, no, you can't do that. You can't have a video that directly contradicts the self-serving claims of the non-movement and not use that to make a fair finding here. And so your point is that these videos don't, far from directly contradicting your client's position, they actually support, or at least could be seen by a trier effect. Maybe a trier effect is deceiving. We know for certain. The problem, it seems to me, was that in Harris, the videotape is dealing with, in essence, split-second decisions to use a particular form of force in the course of the chase. It's those seconds when the officer, if I recall correctly, decided to bump the car he was chasing and what information he had. Here, we're dealing with the whole mosaic of evidence that the police had collected from two states in going into those interrogations to evaluate their reliability. And that seems to me as fine-grained a factual question as one is likely to find. Absolutely. Absolutely. It's a far more nuanced, subjective evaluation. And it's a factual evaluation. It happens to be videotaped. So one legal issue is, should we look at the videotape, right? Correct. For the Fourth Amendment, I think, I posit that's the only legal issue. How about the Fifth Amendment? So when you get to turn to the Fifth Amendment, the only legal issue, I think, that is available there is, were the defendants on notice that their tactics were unconstitutional? That's the million-dollar, qualified million-dollar issue. Which is a really serious question, because you can't leave police officers floating off there, not having any idea, case to case, whether what they're doing is acceptable. And that's Gill and the others. There has to be, they have to be on notice. They are on notice. My concern, counsel, though, is I think you've got a real problem if your focus is on tactics rather than reliability. And let me just lay this out a little bit more. If the police coerce me to give an involuntary confession that implicates me as well as a friend, I don't think my friend has any complaint. He can't suppress evidence that the police derive from their coercive interrogation of me that winds up implicating him, can they? For Fifth Amendment purposes, correct. That becomes a reliability issue. Exactly. And it seems to me that with your several clients, that's really the problem as opposed to coercion. Because if you're talking about tactics, about only verbal tactics, we're not talking about physical coercion here, we're talking about verbal tactics, the case law doesn't provide very clear guidance about that. I beg to differ, and I'd like to make my pitch for it, if I may. I think you get there. First of all, I agree with you that we don't need to go to tactics. I think that you have non-reliability is one way there, and a solid way there. But in the interest in keeping it clear and also answering the question, if you do decide to go the tactic routes, I think you get there very clearly as well. I think, first of all, you have very clear law that you can't use threats against a suspect's family to force a confession. That's Sornberger. And you have very clear threats to each of their family being made, and a particularly vulnerable family being a blended family that it was. You have William being told, or you have Deirdre being told by Defendant Jones, this is the way it's going to happen. There's one, two, three, four, five of you. All of you's going to jail for murder, unless you want to talk and give us your side and help people out, all five of you are going to jail. Police are able to make those threats to gang members, aren't they? To gang members about what? For collective criminal activity. This is to threaten the- Bear with me on that question. Would you agree? I don't know the answer to that, I guess. Does the fact that the defendants or suspects are related change the rules? Yes, I believe so. I believe Sornberger says, threats to a suspect's family or children, even if implicit, certainly may render confessions involuntary for purposes of due process. Threats of justified prosecution? The whole family justified prosecution? How do you get the parents justified? How is threatening to arrest her parents for murder a justified threat? Under any conceivable- Is that what you think he said? Yes. Parents? One, two, three, four, five. I mean, he spells it out. Your entire family's going to jail. William, he's threatened in a way that he'll never see his family again. They play on this, your adopted family, and they talk to William specifically about his foster family, getting kicked out of your foster family and everything else. I mean, that's threats to the parents. That's direct violation, in my mind, of Sornberger. I don't see how much- What else? All right. The second way that you get there is that you can't- and this is Ailman. Justice Wood was on Ailman. You can't push suspects past the point of rational choice. You can't push them to the point where you know that there's nothing else they can do. You can't give them that 80. But how does a police officer know when that line is reached? I mean, it seems to me, in hindsight, a psychologist could perhaps watch the video. But the officers have to operate in real time. If you'd indulge me, I'd love to read this excerpt from two pages, two corresponding pages. So I'm going to leap out a little bit for the interest of time, because my old light's on. But this is not skipping around throughout. No light's on. Oh, good. Well, this is Detective Jones. If you get this off your chest today, I guarantee you can walk out of here a lot better otherwise than you're doing right now. You're hurting right now. I can tell you're hurting. The way you're feeling your chest right now, you're hurting bad. It's burning, man. It's burning hard. Your head's hurting. Your chest is hurting. Come on, man. Breathe. Let the burn go away. Get off the burn. Tell me something. You'll feel the hurt. The pain that you felt just a while ago, it ain't nothing to what you're going to bear here in a little while. You'll go through some pain and burn. You'll go through so heavy on your chest, you ain't going to be able to stand it. You're going to keep feeling the pain, because I can keep turning the pain on. I keep turning it on. I keep turning it on. Or I can relieve it from you. And William says, I'm having a hard time breathing. Detective Jones says, you're having a hard time breathing. You're having a hard time sitting there. You're hurting. You're hurting. You're feeling like you're on fire. You know what we want to hear. You know what we want to hear. And if you want to keep on hurting yourself, hurting your family, you can keep giving us these one round of stories. To say that they don't know that they're pushing this kid over the edge, there's a fact issue here about whether or not they know that they've pushed this kid to the point where he cannot breathe. Defendants say the videos aren't so bad. A jury, myself, the court certainly could find that William is gasping. He is audibly breathing. He is crying. He is struggling. The law makes it clear that even with verbal methods, and there are a number of cases that talk about verbal tactics being enough. You've got Rutledge, Wiedner, Blackburn, Snackcloth, Ailman. They're on notice that you don't have to physically choke the guy in order for him to be pushed over past the point of rational choice. OK, let me see if we can wrap up some loose ends here. Because we've been focusing on the Fourth Amendment and the Fifth Amendment claims. You also put in a substantive due process shocks the conscience claim. But I really wasn't sure what that added. And I wasn't sure how it's consistent with the general rule that if a more specific part of the Constitution governs a claim, you don't just default over to substantive due process also. So does it add anything? I think we plead a number of claims. And you were allowed to plead some, regardless of the viability of all. Here we are. We'd love to go forward on as many as the court will allow us to go forward on. Even to narrow a case is of some meaning to a defendant. And if it's absolutely clear as a matter of law that substantive due process, whatever it does cover, doesn't cover a situation like this, where you've got theories under the Fourth Amendment and the Fifth Amendment that you've argued very strongly and that they've responded to and seem to be the right match for this situation, whether they work or not in the end, being up to a jury. Those are certainly, I agree, our strongest claims. And the only ones, frankly, that I intended to argue this morning, I was going to rely on the briefs for the rest. However, you do have the Evansville Police Department chief saying that he personally was shocked that if these allegations are true, it shocked his conscience. How do you not? I don't know that he was making a legal point. He may not have been. But it seems that a jury could so find as well. I don't want to lose track of the question that you ended with before that you posited to me about the deprivation of liberty, about whether, absent a conviction, you still have a constitutional violation. And absolutely, I assume you're asking about whether Deirdre has a claim despite not being convicted. And I think it's Sorenberger that gives us that absolutely, you can have a constitutional violation. Her damages are the time period in which she was incarcerated and when she suffered. You don't need a conviction for it. What are Andrea's claims? What are Andrea's claims? I don't recall how long she was incarcerated for. She does not have a Fifth Amendment claim. She has a Fourth Amendment claim only. I don't recall whether she has malicious prosecution or not. I apologize. But I agree that she does not have a Fifth Amendment claim, if that's what you're saying. Ms. Loewe, would you agree that once the judge decided there's genuine issues of material fact regarding the confession, that she made no analysis of what qualified immunity may apply in this case? I mean, I can't find that in the opinion, but perhaps you could direct me to that. I would agree that the judge, I think the judge spelled out the law of qualified immunity. I think the judge made ultimate findings. I would agree that the judge could have explained the analysis of how you got from A to B a little better. And I would posit this was a really small issue in the summary judgment briefs. It was, it was, it felt like an afterthought in the summary judgment briefings, and I would. Well, that's why we're here, though, right? It is why we're here. I mean, that's the case today. It's a solid decision, and I'll stand by it. I think it says everything that it needs to say, and I think it makes the findings that we need in order to support it. Could it have spelled it out better? Sure. But it's a solid decision, and I'll stand by it. No, I'm not questioning her analysis on the decision that there's genuine material, but the issue of qualified immunity was raised. It was raised? And it is why we're here today, because it affects our jurisdiction. And she discussed Maxwell, and I mean, she discusses the qualified immunity cases. She sets out the analysis of arguable probable cause. You know, she's clearly thinking about it, and she makes the appropriate findings, and that's sufficient. Any other legal issues you think are presented here? No, I believe there's no jurisdiction for the rest of what they've had to say. So if there aren't any further questions, I'd ask the court to affirm. Thank you very much. All right, thank you. So, Mr. Whitehead, I'll give you a minute, and I'll give Mr. Bell a minute. I did want to address your point, Your Honor. I think you're referring to the argument that while there may be a clearly established right protecting individuals from police officers manufacturing evidence, there's no such right against fabricated police reports that were not used at trial and no conviction resulted. That's relating to the Melissa's prosecution claim. And that's one of the things that the district court was able to do is separately analyze whether each report actually caused any deprivation of rights, and instead just held that as a matter of law, she couldn't say that it didn't cause a deprivation of rights. But that's a factual issue of causation. A false police report, a deliberately false police report, which we have to assume at this point, is like a time bomb in a criminal file, right? It can hurt people later when the officer doesn't control its use. But it resulted in an impossibility. For instance, on William Arbol and Jason Pagent, their report was created nine months after the arrests and months after DITRA was ever released, yet the judge still determined that that somehow caused a deprivation of rights against DITRA. And so that's the analysis that has to be performed. And the only evidence, if I may finish my thought, the only evidence that we have on that nexus between did it cause a deprivation of rights is the prosecutor who said this was a confession case. The reports had no material effect on his decision to go to trial. And so because that prong of did it cause a due process violation or a deprivation of rights does not exist. So you want us to decide that causation issue on appeal? Yes, because it resulted in impossibility. And I do think that that's a- How is that a qualified immunity issue? Because the first prong is, did it cause a constitutional violation? And you have to go through the analysis of each prong of the malicious prosecution claim. So you think causation is always available as an issue in a qualified immunity case? I don't think it always, but in this case, the court did say, as a matter of law, I cannot find, and then use double negative, I cannot find that the reports did not cause any deprivation of rights. I see my time is up. Thank you very much. Okay, thank you very much. Anything further, Mr. Vail? I have one minute, is that correct? You have a minute. The clearly established law is the key issue, and that's an abstract issue of law, we know that. Fair versus Michael C., Lido versus Chapala, U.S. versus Lee, Etherly versus Davis were all decided in this circuit. None of those say that what they're criticizing in this case was improper or unconstitutional. Leading questions, repeating questions, mere verbal threats, good cop, bad stop, false evidence poised, fact feeding, vague promises of leniency, admonitions to tell the truth. The family threat, the reason they talked about the family is because four of them were involved, okay? There were three of them plus another foster kid in the van. There's no case in 2011, excuse me, June of 2012, that said that that was impermissible in this circuit. There was no clearly established law, period. I mean, to me, that's a game over. There was no clearly established law. That's an abstract issue of law. That's appropriate for this court to decide. There's no case that said what these officers did on this. We may not like it, we may not think it's advisable, but the cases say, even if the officers are insistent or whatever, those are typical interrogation tactics, the type of thing that goes on in police stations all day, every day, and it passes constitutional muster as of June of 2012, which is the key point in time for whether the law was clearly established. All right, thank you very much. Thank you. Thanks to all counsel, we will take the case under advisement. Thank you. It's nice to see you.